9th day of February 2015

Versace19.69 Abbigliamento Sportivo S.r.l.

## LICENSE AGREEMENT

WITH

**Best Brands Consumer Products Inc.**

Contract No. VAS0019USA



By this Agreement made on the 9th day of February 2015 between the Licensor and the Licensee identified below do by signing at the foot of this page agree the Terms appearing hereafter and the Definitions appearing below.

**DEFINITIONS:**
In the Terms appearing overleaf the following words and phrases shall have the meanings set out below:

**A. THE LICENSOR:** Versace 19.69 Abbigliamento Sportivo s.r.l. of Via Daniele Crespi, 1
21052 Busto Arsizio (VA)
Italy
P.IVA 03289170122

AGENT: Valero Enterprises
26500 Agoura Rd
Suite 130
Calabasas, CA 91302
USA

MASTER AGENT: PJB Brands Ltd
77 Strovolou
Strovolos Center
Office 204
2018 Nicosia
Cyprus
Reg. 276253/VAT CY 10276253T

**B. THE LICENSEE:** **Best Brands Consumer Products Inc.**
**c/o Best Brands Sales Company LLC**
**5th Floor**
**20 West, 33rd Street**
**New York**
**NY 10001**
**U.S.A.**

**C. PROPERTY:** **Figurative trademark "V 19.69 Italia"** under Annex A and further defined below under Trademarks, including the right to use the company Name as hereinafter set forth, and as shown under Annex B.

**D. THE RIGHTS:** All rights in and to the Properties including without prejudice to the generality of the foregoing any patent, copyright, registered design, trade mark (whether registered or unregistered) or other industrial or intellectual property right subsisting in the Territory in respect of the Properties or any of them and applications for any of the foregoing including without prejudice to the generality of the foregoing all any such rights in and relating to the series of drawings, designs, illustrations, transparencies (film positives), film and cards and the text therein now or during the currency hereof owned by the Licensor and which depict the characters the subject matter of the Properties.

**E. THE TERRITORY:** United States of America, its territories and possessions, Canada
Orders for International Stores only of Costco and Sam's Club Worldwide

**F. DISTRIBUTION:** Year 1 & 2 of sales: Speciality, Department Stores, independents, mid tier, home centers, off price, clubs, etailers, wholesalers/distributors that distribute to Approved distribution channels.
Year 3 of sales and beyond: All of the above, upon approval from Licensor mass market.

**G. THE TERM:** From: execution date of this agreement       Until: 30 June 2020

**H. THE ROYALTY
RATE:** 6% on wholesale price for all channels of distribution.



2

| I. | MARKETING DATE: | September 2015 |
|----|-----------------|----------------|
|    | IN STORE DATE:  | April 2016     |

| J. | a) THE ADVANCE: | $100,000 US on signature |
|----|-----------------|--------------------------|
|    | b)THE GUARANTEE: | $150,000 US with remaining payments: $50,000 paid on or before 1 June 2017. |

**K. THE PRODUCTS:**

Kitchen Textiles including but not limited to: kitchen towels, dish cloths, bar mops, pot holders, oven mitts, Trivets, hot pads, pot grabbers, pot grippers, pot handle sleeves, spoon rests aprons, kitchen rugs/mats, shelf/drawer liners(incl. paper/plastic), chair pads, appliance covers, moppines and drying mats and racks

table linens namely: indoor & outdoor tablecloths, napkins, table runners, placemats and coasters.

Napkin rings, doilies, sponges and kitchen cleaning gloves.

Rugs, door mats

Dinnerware, Drinkware, Glassware, Stemware Barware, Wine Accessories, Flatware, Serveware and all associated accessories and related serving pieces Home Décor; Vases, Trays, Boxes for décor, Bowls for decor, Candle Holders/Votives, Candle Hurricanes- non-exclusive, Apothecary Jars, Figurines, Bottles, picture frames- non-exclusive, accent pieces, photo storage-non exclusive, wall decor

| L. | THE COPYRIGHT NOTICE: | © 'year' Versace 19.69 Abbigliamento Sportivo Srl |
|----|-----------------------|---------------------------------------------------|
|    | THE TRADEMARK:        | V 1969 Italia                                     |

| M. | THE INSURANCE RATE: | $1,000,000 US |
|----|---------------------|---------------|

| N. | SELL-OFF PERIOD: | 180 days |
|----|------------------|----------|

| O. | SPECIAL CONDITIONS: | 1) This agreement is granted on an exclusive basis. However, Licensor reserves the right to have an exclusive 'Made in Italy' range of products offered for sale only in High-end department stores and boutiques the Territory. 2) All territories to be reported separately |
|----|---------------------|-------|

**P. RENEWAL OPTION:** Renewal Option applies with the following terms:

This agreement will automatically renew for another five (5) year period upon the condition if (1) Licensee has reported $500,000 US in royalties during the Term. Licensee may elect to not renew this Agreement by giving Licensor written notice of same six (6) months prior to the expiration of the agreement, and if Licensee shall not have provided Licensor with such notice by the Election Date, this Agreement shall automatically renew as set forth above.

(2) Licensee has honoured all material articles outlined in this agreement and paid all advances and royalties due and is not in breach of any material article in this agreement as defined but not limited to Article 14 of this agreement.

*For and on behalf of*
VERSACE 1969 ABBIGLIAMENTO SPORTIVO LIMITED

Signed by:
Title:
On behalf of the Licensor

*Authorized Signatur~(s)*

Signed by:
Title:
On behalf of the Licensee

3

## WITNESSETH:

**WHEREAS,** Licensor declares and guarantees that it is the common law owner and beneficiary of the figurative Trademark "V19.69 Italia" (hereinafter the **"Trademark"**) - (ANNEX "A"), and that Licensor has filed an application with the USPTO for registration of the **Trademark** in the territory of the USA (US Serial Number 86291539) for, among other goods, Class 24 (Nice Classification) goods, and Class 21 (US Serial Number 86450233).

Licensor further declares and guarantees that it is the registered owner and beneficiary of the company name **"Versace 19-69 Abbigliamento Sportivo S.R.L."** which is registered at the Chamber of Commerce of Milan (Italy) under no. 231460/2005 pursuant to notarial deed no. 40871/19812/14-09-2009 (hereinafter the **"Name"**). The **Trademark** is used solely by the company with legal name **"Versace 19.69 Abbigliamento Sportivo S.R.L."** within its commercial and general business activity and solely for the purposes of such activity.

**WHEREAS,** Licensor declares and guarantees that the aforementioned **Trademark**, is used by Licensor within its commercial and general business activity and solely for the purposes of such activity, and that no dispute whatsoever, no litigation exists (judicial, administrative or extrajudicial) regarding the aforementioned application of the **Trademark** in connection with the Products set forth under Definition **K** (**"Products"**) in the Territory.

**WHEREAS,** Licensor declares and guarantees that it has the full legal right and authority to enter into this agreement and to grant a license to Licensee to use the Trademarks in connection with the manufacture, sale and distribution of the Products throughout the Territory.

**WHEREAS,** Licensee accepts the guaranties of the Licensor and based on those guaranties decides and desires to obtain a license to use the Property in the countries set forth under Definition **E** (**"Territory)** in connection with the products set forth under Definition **K** (**"Products"**);

**NOW, THEREFORE,** in consideration of the mutual covenants hereinafter set forth, Licensor and Licensee do hereby respectively grant, covenant and agree as follows:

### 1. LICENSE

In consideration of the payment by Licensee to "Versace 19.69 Abbigliamento Sportivo S.r.l." of the Advance and Royalties herein provided for the Licensor during the Term throughout the Territory and subject to the terms and conditions hereof the Licensor grants to Licensee the exclusive License under the Rights (to the extent necessary for the purpose of this Agreement)

(a)     to use and/or make representations of the Property or any part thereof in connection with the manufacture, distribution, promotion and sale of Products, including the use of the full company Name of the Licensor on all packaging, swing tickets, sewn in labels, advertising, catalogues and POS material in accordance with article 4 (u).

(b)     to use and apply the Property on or in connection with the sale of Products subject to the Terms and Conditions hereof

### 2. RESERVED RIGHTS

(a)     Subject to the provisions hereof, as referred to in the recitals (O) under the definitions, Licensee hereby acknowledges and agrees that the Licensor shall have and retain the exclusive rights to license any third party to utilise the Property in connection with any articles including the products which retained right may be exercised by the Licensor only for co-branded products and collaborations concurrently with the rights licensed by this Agreement, provided none of the foregoing shall unreasonably compete with the business of Licensee.

(b)     Without prejudice to (a) the above, the Licensor shall have and retain the sole and exclusive right to license any third party to utilise the Property in connection with any articles, including Products, in

connection with any premiums give-aways or promotional arrangements. The Licensee shall not be entitled to use, sell or provide Products in connection with any premiums, give-aways or promotional arrangements.

## 3. THIRD PARTY MANUFACTURING

(a)     In the event Licensee is not a manufacturer of Products Licensee will subject to the Licensor 's prior written approval be entitled to engage a third party manufacturer identified to the Licensor prior to engagement to make and produce Products provided Licensee obtains from such manufacturer and delivers to the Licensor a letter in the form contained in the Schedule 3 signed by such manufacturer hereto.

(b)     The use by Licensee of any such third party manufacturer shall in no manner whatsoever affect Licensee's obligations hereunder.

(c)     If such manufacturer utilizes the Property for any unauthorized purpose, Licensee shall insure that such utilization is immediately halted. If, by reason of Licensee not having supplied the above mentioned agreements to Licensor or not having given Licensor the name of any supplier or distributor, Licensor makes any representation or takes any action and is thereby subjected to any penalty or expense, Licensee will indemnify Licensor for any cost or loss Licensor sustains.

## 4. LICENSEE'S OBLIGATIONS

Licensee undertakes to the Licensor that it will during the Term and any permitted Sell Off Period:

(a)     To develop and submit to Licensor, within 30 (thirty) days of receipt of written request, a marketing and business plan detailing information including, but not limited to: Licensee's product development plans, advertising, marketing, promotional activities and current company annual report concerning and pertaining to the license herein granted to Licensee.

(b)     If by latest 1 January 2018 Licensee has still not manufactured and sold Product in sufficient quantities to meet the reasonably anticipated demand for same, Licensor will send notification to Licensee who will have 3 months to cure after which Licensor has the right to immediately terminate these Products/Territories not fulfilled by Licensee.

(c)     Licensee shall begin the bona fide development and marketing of the Products on or before the Marketing Date listed in I in the Definitions.

(d)     Licensee shall manufacture, distribute and sell the Products on a national basis, throughout the Territory, to the distribution channels listed, ~~1 April 2018 but~~ no later than 1 January 2018.
JA

(e)     In addition to royalty statements furnish to the Licensor any information reasonably required by the Licensor relating to any of the matters covered by this Agreement including samples of catalogues and price lists referring to Products

(f)     Nor do or fail to do anything which may damage or prejudice the interest of the Licensor and in particular but without prejudice to the generality of the foregoing the Property or the Rights

(g)     Perform its obligations hereunder in conformity with any directions and reasonable instructions received from the Licensor from time to time

(h)     Inform the Licensor forthwith of any unlicensed or incorrect use of the Property or infringement of the Rights and render all assistance reasonably required by the Licensor to end the same

5



(i)   Not place, distribute, disseminate or supply any advertisements or other promotional or sales literature of any nature whatsoever which refers or relates to the Licensor and/or the Rights and/or the Property without prior written approval of the Licensor.

(j)   Meet the Advance and Guarantee set out in J in the Definitions above

(k)   Pay Royalties forthwith when due

(l)   At all times during and after termination hereof keep confidential all information received from the Licensor and designated by the Licensor as confidential or which ought reasonably to be regarded as confidential

(m)  Destroy any Products which are in any way defective or do not conform in every respect with the samples approved pursuant to Article 9 hereof

(n)   Not alter or modify the representation of the Property in any way without the Licensor 's prior written consent

(o)   Compensate the Licensor for any use by Licensee of the Rights otherwise than in accordance with this Agreement

(p)   Not use any name, word, device, mark, character or other matter not falling within the Rights in such manner as to infringe any of the Rights

(q)   Not to pursue an active policy of putting the Products on to markets outside the Territory which are reserved to the Licensor or Licensed by the Licensor to other licensees and in particular not to engage in advertising specifically aimed at those markets or to establish any branch or maintain any distribution depots in those markets

(r)   To promptly notify in writing the Licensor of any approach from any customer outside the Territory to supply Products

(s)   At the request of the Licensor, supply Products to customers of the Licensor at commercially reasonable prices and on terms no less favourable than those offered to other customers of the Licensee of a similar size

(t)   At the request of the Licensor, supply Products to the Licensor at commercially reasonable prices and on the terms no less favourable than those offered to other customers of the Licensee of a similar size

(u)   Must affix the Licensor's company Name and details as specified in the style guide on all swing tickets, sewn in labels, packaging, advertising, POS as shown by example in Annex B. Artwork is not final and subject to change. All packaging and advertising materials to be submitted to Licensor for final approval.

## 5. PAYMENT

(a)   Licensee shall pay to Licensor, a non-refundable Guarantee including an Advance as set forth under Definition J.

(b)   Licensee agrees to pay to Licensor the Advance as an advance against Royalties upon the date hereof and such Advance may be deducted from Royalties subsequently payable hereunder but in the event that all the Royalties payable hereunder amount to less than the Advance or Guarantee no part of the Advance or Guarantee shall be repayable, unless Licensor's trademark is deemed invalid or unenforceable or by reason of the fact that Licensee's use of the Property strictly in accordance with the terms of this Agreement infringes upon the rights of a third party. In these occurrences, royalty advance shall be repaid to Licensee from Licensor. Such Advance and royalties accruing from sales within the Territory shall be credited against the Guarantee detailed in J above. Royalties accruing during any sell-off period or from sales outside the Territory shall not be credited against the Guarantee.

(c)   All payments by Licensee to Licensor to be in United States Dollars.

(d)   All payments to be made promptly to Licensor:

**Wiring Instructions:**

6

*Beneficiary: Versace 19.69 Abbigliamento Sportivo Srl*
*HYPO ALPE ADRIA BANK S.p.A*
IBAN: IT36 A030 1150 2400 0007 8300 073
BIC: HAABIT2U020
C/C: 20/78300073/

Hypo Alpe Adria Bank S.p.A. (contact details):
Via Alp Adria, 6 33010 Tavagnacco (Ud)
tel.+39 0432 537 211 fax +39 0432 538 551
e-mail: bank.italy@hypo-alpe-adria.com

(e)   Any Advance or Guarantees which are not paid within 10 days of due date for payment shall bear interest at prime rate as published in the Wall Street Journal from the due date until the date payment is made and Licensee will pay such interest together with the payment.

## 6.   ROYALTIES

(a)   Within thirty (30) days after the close of each quarter, Licensee shall furnish to Licensor via the Agent complete and accurate statements of its sales of Products and royalties due to Licensor, in the format(s) as made available to Licensee and Agent, and which for the purposes of this Agreement shall be known as the Royalty Report ("Royalty Reports"). Royalty Reports shall require the entry of information including, but not limited to Licensed Property, Licensed Product, Description, Retail Channel of Distribution, Territory, Total Sold (if applicable, adjustments or permitted deductions thereto) and a calculation of Royalties due to the Licensor. All Royalty Reports shall be certified as correct by Licensee.

|                      | Payments and statements         |
|----------------------|---------------------------------|
| Quarter:             | due no later than:              |
| January - March      | April 30th                 |
| April - June         | July 31st                  |
| July - September     | October 30th               |
| October – December   | January 31st               |

(b)   In the event this Agreement does not commence on the first day of any such period, the first Accounting Period shall be such shorter period as ends on one of those dates; and, in the event this Agreement does not end on any one of those dates, the final Accounting Period shall be the period from the day after the last of those dates until the date of termination.

(c)   Receipt or acceptance by the Licensor of any statement furnished pursuant to this Agreement or of any sums paid hereunder shall not constitute a waiver of any breach of any terms hereof by Licensee (if any such shall occur) and shall not preclude the Licensor from questioning the accuracy thereof at any time and in the event that any inconsistencies or mistakes are discovered in such statements or payments they shall immediately be rectified and the appropriate payments made by Licensee.

(d)   If applicable, licensee will concurrently with the statement required by Article 6(a) above pay Royalties to the Licensor for the amount of Royalties shown on the said statement to be due and VAT or any other sales or license taxes, or any other applicable tax thereon.

(e)   The Royalties payable hereunder shall be that percentage of Licensee's net sales of Products as is shown as the Royalty Rate at H and "net sales" for this purpose means the total amount of all sales of all Products sold by Licensee, exclusive of any taxes, freight or transportation charges and less any returns (not to exceed 10% of sales on an annual basis), and less any Allowable Deductions hereinafter defined:

"Allowable Deductions" must be documented and shall mean:

7



(i) discounts, credits or payments granted by Licensee to a retailer and earned by said retailer solely as a result of shipments/purchases to or by said retailer in excess of a designated volume level(s) (e.g., the discount, credit or payment is earned by surpassing fixed volume level(s) of shipments/purchases of Licensee's products to or by said retailer) or a growth-based volume level (e.g. the discount, credit or payment is earned by designated increases in shipments/purchases of Licensee's products to or by said retailer from measurement period to measurement period) and is calculated by multiplying a percentage factor by the total amount of qualifying shipments/purchases;

(ii) credits or payments (sometimes referred to as either placement, slotting or listing allowances), made by Licensee pursuant to written agreements with third party retailers (e.g. not owned by or affiliated with, Licensee) for the purpose of securing volume or retail space allocation commitments or both, for the Articles and other products not licensed by Licensor;

(iii) actual quantity, trade, advertising, markdown and defective allowances/cooperatives/discounts, freight costs to customers

(f)    Intentionally omitted.

(g)    Royalties shall become payable on despatch of Products to Licensee's purchaser or the said purchaser's agent or upon despatch by Licensee of any invoice for any of the Products (whichever shall first occur) whether the price is actually paid or not.

(h)    In no event will any Royalties paid by Licensee be repayable.

(i)    Any Royalties which are not paid on or before the due date for payment shall bear interest as provided in article 5 (e) above, from the due date until the date payment is made and Licensee will pay such interest together with the payment and show the same in the statement referred to in (b) above.

(j)    In the event that the Licensor has occasion to instruct solicitors by reason of Licensee's failure to render statements and/or to make payments of Royalties in accordance with the provisions hereof Licensee agrees to pay any and all reasonable costs incurred by the Licensor on a full indemnity basis.

## 7. AUDIT

(i)    Licensee shall keep accurate books of account and records at its principal place of business of all transactions relating to or affecting this License, during the License Term and for a period of two years thereafter.   Licensor or its representative shall have the right during reasonable business hours to examine and verify Licensee's physical inventory of the Licensed Products as well as Licensee's books of accounts and records, and to make copies and extracts thereof.

(ii)    In the event that an audit by Licensor discloses an underpayment in royalties due Licensor, Licensee shall promptly pay Licensor such discrepancy plus a late interest charge (as provided in article 5 (e) above) from the day such payments were due.  If such audit discloses a discrepancy of ten percent (10%) or more for any quarter, Licensee shall also reimburse Licensor for all reasonable costs incurred by Licensor in connection with the audit.

## 8. TAXES ON ROYALTIES

(a) Not applicable, intentionally omitted.

## 9. ARTWORK,  REFERENCE MATERIALS, AND INTELLECTUAL PROPERTY USE

8



(a)     Licensor shall provide Licensee with a style guide for the Licensed Products and allow Licensee to review and select Property materials for use on the Products. Licensee acknowledges that it must use the latest Style Guide provided by Licensor. If a new style guide or amendments are issued, then new designs will be developed and launched within a reasonable timeframe as agreed between Licensee and Licensor and upon reasonable depletion of stock featuring former design.

If Licensee should request from Licensor bespoke artwork or reproduction materials in connection with this license, such artwork and reproduction materials will be rented by Licensor to Licensee on terms mutually agreed upon by the parties.

Said reproduction materials will be returned to Licensor upon its request, and upon termination of this Agreement, all design data, positives, transparencies and other reproduction materials furnished by Licensor, then in possession, custody or control of Licensee shall be immediately returned to Licensor, or at Licensor's option, shall be destroyed by Licensee, and Licensee will give satisfactory evidence to Licensor of the destruction thereof. Licensee shall take all appropriate steps to protect and preserve said Copyrights for Licensor in the Territory, subject only to their use by Licensee pursuant to this Agreement. Upon termination of this Agreement, Licensee shall immediately cease to use Licensor's Copyrights and any reproduction materials furnished by Licensor, pursuant hereto.

Licensee agrees to affix to the Products, packaging therefor, and advertising and promotional materials depicting the Products, copyright notices in the form designated by Licensor and any other notices in compliance with applicable copyright and trademark laws. The required notices shall appear on hang-tags for the Products when the Products are not otherwise packaged. The size and positioning of the copyright notice shall be approved in advance by Licensor

(b)     Licensee shall not at any time attack, question or deny the validity of Copyrights or the translations of same, or Licensor's title thereto or interest therein or do any other act likely or tending to cause impairment of the value of said Copyrights or the translations of same. Further to this end, Licensee shall not claim at any time any interest or right in or to any Copyrights or translations of same in any country of the world and, if required by law, shall cause this Agreement and its Schedules to be recorded or filed with the appropriate governmental authority(ies), the expense of such recording or filing to be borne by Licensee.

In the event Licensee manufactures and distributes any of the Products without the appropriate trademark and copyright notices, the Licensee shall, at its sole expense, recall those Products and incorporate the appropriate notice.

(c)     Licensee irrevocably and in perpetuity assigns to the Licensor all worldwide, right, title and interest in and to any artwork incorporating the Property. Licensor has the sole and exclusive right to use, change, license or modify such artwork, without any obligation, financial or otherwise to Licensee. All such artwork which qualifies as a "work made for hire" under applicable copyright laws in the Territory are agreed to be "work made for hire" owned by Licensor.

(d)     Licensee shall affix the Trademarks to the Products and only employ such Trademarks in the packaging, promotion and display of such Products in strict accordance with the written instructions and specifications of Licensor. Licensee agrees to conform all of its usage of the Trademarks (whether on product, packaging, retail promotional material advertising, signs, or other material) to the standards of use approved by Licensor with respect to size relationships, positioning of elements, lettering styles, and other matters relevant to the general appearance and presentation of such trademark.

(e)     Licensee shall not use any trademarks, product names, or other such designations on any Product, without first obtaining Licensor's prior written consent thereto.

(f)     Licensee shall not claim at any time any interest or right in or to any trademarks or trade names registered or used by Licensor in any country of the world and, if required by law, Licensee shall cause

9



this Agreement and its Schedules to be recorded with the appropriate governmental authority(ies) in the Territory so as to establish the necessary "use" of such Trademarks by Licensor. All uses of the Trademarks by Licensee shall inure solely to the benefit of Licensor.

(g) Licensee agrees, during and after the term of this Agreement, to refrain from adopting or using, directly or indirectly, as a trademark, service mark, trade name or corporate name, or part thereof, any of the Trademarks licensed hereunder or any portion thereof, either on the Products (except as licensed herein) or on any other products, and to refrain from registering or attempting to register, directly or indirectly, any of the same names as a trademark, service mark, trade name or otherwise.

(h) Nothing herein contained shall be interpreted or construed as a transfer of ownership or sale by Licensor to Licensee in whole or in part, of any invention, discovery, or improvement, patent, patent application or trademark, or of any trade secrets disclosed to Licensee. Upon the termination of this Agreement, Licensee agrees to immediately discontinue completely the use of any such Trademark or any mark or name which infringes thereon.

## 10. PRODUCT DESIGN, APPROVALS AND SAMPLES

(a) Licensee warrants that the Products shall be of good quality in design, material and workmanship and shall be suitable for their intended purpose; that no injurious, poisonous, deleterious or toxic substance, material, paint or dye will be used in or on the Products; that Products will not be inherently dangerous to the users thereof; and that the Products will be manufactured, packaged, marketed, sold and distributed in strict compliance with all applicable laws and regulations and meet all industry standards in the Territory. As such, Licensee agrees that it will be solely responsible for any claim or demand alleging that any Product is unsafe, defective, or otherwise unsuitable even though Licensor may have approved the use of the Property thereon, and may have offered suggestions relating to the design, manufacture, or sale of the Product.

(b) In advance of manufacture and sale of any Products pursuant hereto, Licensee shall furnish to Licensor, four (4) final samples and to Agent two (2) of each of the packaged products to be sold for written approval as to artwork, quality, appearance, materials, workmanship and all other construction and aesthetic aspects of the Products.

(c) Licensee shall also submit to Licensor copies of all proposed advertising and promotional materials. During the term hereof, Licensee shall, at Licensor's request and from time to time, furnish additional samples of finished goods to ensure that the quality of the Products made pursuant hereto conforms to the samples approved. Products not complying with applicable laws, regulations and voluntary standards shall be deemed unapproved, even if previously approved by Licensor, and shall not be shipped unless and until they have been brought into full compliance therewith. Both before and after Licensee places Products on the market, Licensee shall follow reasonable and proper procedures for testing that the Products comply with such laws, regulations and standards. Licensee shall supply Licensor with relevant test certificates upon request, if any.

(d) Licensee agrees not to use the Licensor's trademarks, business names, artwork and/or designs or any component thereof in any business sign, business cards, stationery or forms nor as part of the name of the Licensee's business or any division thereof, except as provided in this Agreement.

(e) Licensee and its Manufacturers agree to comply with the requirements outlined in the attached Schedule 3A.

10



(f)     In order to assure that the development, manufacture, merchandising, appearance, quality and distribution of products bearing the Property is consistent with the Licensor's name and the goodwill associated with the Property, Licensee shall submit all artwork, materials and Products and all packaging and promotional materials related thereto to Licensor for written approval as to workmanship and quality thereof, at all stages in its development as set forth below:

Licensed Product/Packaging Approval Procedures

(1)     Concept/Rough Artwork Review
        a. LICENSEE submits rough art to LICENSOR
        b. LICENSOR reviews and approves or requests changes
        c. LICENSOR returns rough art to LICENSEE

(2)     Finished Artwork Review
        a. LICENSEE submits final original art or materials to LICENSOR
        b. LICENSOR reviews and approves or requests changes
        c. LICENSOR returns original art to LICENSEE

(3)     Strike-Off/Prototype Review
        a. LICENSEE submits to LICENSOR, a prototype or strike-off of the LICENSOR'S design
        b. LICENSOR reviews and approves or requests changes
        c. LICENSOR returns materials to LICENSEE

(4)     Final Production Sample Review
        a. Before shipping to accounts, LICENSEE submits to LICENSOR & AGENT a total of 6 production samples of each style number.
        The quantity of such samples is specified in the license agreement.
        b. LICENSOR reviews and approves or requests changes in production samples.

(g)     Licensee shall send all materials to be approved to Licensor at the address set forth in Article 24, or at such other address as Licensor may provide, and Licensor shall have ten (10) working days from the date it receives such materials to approve or disapprove the submission in writing. Licensor may grant or withhold approval hereunder at its absolute discretion and reserves the right to reject an item approved at a prior stage if in its physical form it does not meet Licensor's standards or departs from the approved sample. If Licensee does not receive a response from Licensor within ten (10) working days, the submission shall be deemed un-approved.

(h)     The rights granted hereunder do not permit the sale of Products not suitable for sale at list price because they contain minor production or material flaws not affecting proper usage of the Property, otherwise known as "seconds" or "irregulars". All Products, packaging, labelling, point of sale, sales materials, and advertising bearing the Property which do not meeting the standard of approved samples shall be destroyed and certificates confirming destruction shall be supplied to the Licensor upon request.

(i)     No Licensed Product shall be distributed or sold by the Licensee without Licensor's express prior written approval.

## 11. INSURANCE

(a)     Licensee agrees that prior to the sale of any Products Licensee will at its own expense procure and maintain throughout the Term satisfactory insurance with a recognised insurance company on behalf of itself and the Licensor in respect of liability to the public at large concerning Products, the extent of such insurance to be at the discretion of Licensee but in any event not less than the Insurance Rate. Licensee

11



will ensure that the interest of the Licensor in the said policy of insurance is duly endorsed thereon and prior to the In Store Date as well as at the request of Licensor will produce the policy of insurance duly endorsed and the receipt for the last premium paid in respect thereof or a certificate of insurance in lieu thereof. Any proposed change in the policy of insurance shall be submitted to the Licensor for its prior approval and the Licensor shall be entitled to a copy of the then prevailing policy of insurance which shall be furnished to it by Licensee.

(b)     Without imposing any obligation on the Licensor in relation hereto in the event that Licensee fails to effect such insurance the Licensor shall be entitled to effect such insurance as it thinks fit and the costs thereof shall be a debt due from Licensee to the Licensor payable forthwith upon demand

## 12. INDEMNITY

(a)     Licensee shall hold Licensor and its affiliates, as well as their respective managers, officers, directors, members, shareholders, owners, employees and agents, and their respective successors and assigns, harmless from and shall indemnify each of them against any losses, liabilities, damages and expenses (including interest, penalties and reasonable attorneys' fees and expenses) that any of them may incur or become obligated to pay, or for which any of them may become liable to pay in any action, claim or proceeding against any of them, by reason of any representation or warranty on the part of Licensee being untrue in any material respect or by reason of any acts, whether of omission or commission, by Licensee or any member of the Licensee, any Contractor, any of Licensee's suppliers or any of their respective affiliates, agents or employees arising out of or related to this Agreement. Licensee's indemnification obligation also shall apply to any action, claim or proceeding against any of the indemnities brought by or on behalf of any member of the Licensee, its customer, any Contractor or any of Licensee's suppliers arising out of or relating to this Agreement or the performance of Licensee hereunder or their relationships or dealings with Licensee, the termination thereof or otherwise, including any action, claim or proceeding against any of the indemnities for the payment of a goodwill indemnity or other termination payment. The provisions of and Licensee's obligations under this paragraph shall survive Termination.

(b)     Licensee indemnifies Licensor from any claim resulting from the Products that Licensee manufacturers.

(c)     Licensor hereby saves and holds Licensee and its respective affiliates harmless of and from and indemnifies each of them against any and all claims, losses, liability, judgements, penalties, damages and expenses (including reasonable attorneys' fees and expenses) that they or any of them may incur or be obligated to pay, or for which they or any them may become liable or be compelled to pay in any action, claim or proceeding against them or any of them, by reason of the fact that Licensee's use of the Property strictly in accordance with the terms of this Agreement infringes upon the rights of a third party and by reason of any acts by Licensor or any of its respective affiliates, agents or employees arising out of or related to this Agreement. Licensor's indemnification obligation shall also apply to any action by reason of any representation or warranty on the part of Licensor being untrue in any material respect or by reason of any acts, whether of omission or commission, by Licensor or any member of the Licensor, or any of their respective affiliates, agents or employees arising out of or related to this Agreement. Licensor's indemnification obligation also shall apply to any action, claim or proceeding against any of the indemnities brought by or on behalf of any member of the Licensee, its customer, any Contractor or any of Licensee's suppliers arising out of or relating to this Agreement or the performance of Licensee hereunder or their relationships or dealings with Licensee, the termination thereof or otherwise, including any action, claim or proceeding against any of the indemnities for the payment of a goodwill indemnity or other termination payment.

The provisions of and Licensor's obligations under this paragraph shall survive Termination.

(d)     Without prejudice to paragraph above, Licensor shall not bear any liability for trademark infringement, copyright infringement or any other misuse or infringement of third party rights, including third-party trademarks, copyrights, trade secrets or other, committed by Licensee or Licensee's contractors, suppliers, sub-licensees, collaborators, or employees. Licensee shall take all necessary steps to ensure that conduct by it or by contractors, suppliers, sub-licensees or employees preserves, in all respects, such third-party rights.

(e)     Any person seeking indemnification under paragraph 12 (a), 12(c) and 12(d) (the "Indemnitee") shall use reasonable efforts to give Licensee or Licensor, as the case may be (for purposes of this paragraph, the "Indemnitor"), notice of any action, claim or proceeding for which indemnification is being sought promptly after the Indemnitee becomes aware of such action, claim or proceeding; provided, however, that the

12



failure of the Indemnitee to provide the Indemnitor prompt notice of any such action, claim or proceeding shall not adversely affect the Indemnitee's rights under this Agreement unless, and then only to the extent, that the Indemnitor is materially prejudiced by such failure. Upon receiving notice of any action, claim or proceeding for which an Indemnitee is seeking indemnification, the Indemnitor, in its sole but reasonable discretion, shall take such action as it deems advisable to defend such action, claim or proceeding on behalf of the Indemnitee. In the event appropriate action is not taken by the Indemnitor within 20 days after its receipt of notice from the Indemnitee, the Indemnitee shall have the right to defend such action, claim or proceeding, in which case the Indemnitor also shall reimburse the Indemnitee for its costs in defending such action, claim or proceeding, but no settlement thereof may be made without the approval of the Indemnitor, which approval shall not be withheld or delayed unreasonably. Even if such appropriate action is taken by the Indemnitor, the Indemnitee may, at its own expense, be represented by its own counsel in such action, claim or proceeding. In any case, the Indemnitee and the Indemnitor shall keep each other fully advised of all developments and shall cooperate fully with each other in all respects in connection with any such defence as is made. The provisions of, and the Indemnitees' and the Indemnitors' respective rights and obligations under this paragraph shall survive Termination

## 13. PROTECTION OF THE PROPERTY AND THE RIGHTS

(a)    Licensee acknowledges that the Property and the Rights are the sole property of the Licensor and that the Licensor has the exclusive right to control and to license the same in the Territory and agrees that it will not at any time during the Term or thereafter dispute or contest or impair directly or indirectly the Licensor 's interest therein.

(b)    It is agreed that all use of the Property by Licensee is on behalf of and accrues to the benefit of the Licensor.

(c)    Licensee hereby warrants to the Licensor that notwithstanding Licensee's knowledge and experience of the business of producing and distributing goods such as Products it knows of no legal or other obstacle or liability concerning the use of the Property or any part thereof on or in relation to Products.

## 14. BREACH AND TERMINATION

(a)    This Agreement may be terminated not before and not less than 30 days prior notice in writing is given to cure and failure to cure by Licensor should any of the eventualities set forth in paragraph (b) hereof occur, or by Licensee, should any of the eventualities set forth in paragraph (c) hereof occur. Such termination shall be effective as herein provided upon the giving of written notice of same by the terminating party to the other party.

(b)    Licensor may terminate this Agreement as here in provided by written notice to the Licensee in the event that:

(i) Licensor shall at any time reasonably consider that the Products manufactured, sold or distributed in the Territory pursuant to this Agreement do not meet the standards of quality control contemplated hereinabove or if Licensee uses any unapproved artwork or promotional materials; or

(ii) Licensee fails to make any payments set forth in Article 5 hereof and does not cure same within thirty (30) days of notice of default;

(iii) Licensee attempts to assign or sublicense its rights hereunder, except as permitted in Article 22 hereof;

(iv) Any governmental agency finds that any of the Products are defective or unsafe in any way; and Licensee fails to take prompt action to cure the issue; Termination shall apply to such defective or unsafe products that Licensee fails to cure.

(v) Licensee fails to maintain the insurance required in Article 11;

13



(vi) If Products are not being manufactured and marketed to meet market demands and has not sold any Product in Territory by latest 1 January 2018, as defined in article 4(b) and has not cured such in 3 months after Licensors notification

(vii) If Licensee sells outside its Territory without Licensor's knowledge or prior written consent.

(viii) If Licensee does not adhere to the agreed distribution channels and Product roll-out launch per distribution channel as provided in the Definitions. Any change to such distribution channel will be pre-agreed by Licensor and Licensee prior to Licensee's action.

(c) If either party hereto is in material breach of any terms and conditions of this Agreement other than as set forth in subsection (a), and such party fails to cure the breach within thirty (30) days after the date of receipt of written notice from the other party advising of the nature of such breach; or if either party breaches a provision of this Agreement after being notified in writing of a previous breach of the same provision in the same calendar year (whether the first breach was cured or not); then the party not in default shall have the right to terminate this Agreement forthwith by written notice to the party in breach, as provided in this article 14.

(d) Upon termination of this Agreement howsoever arising Licensee shall, (except as otherwise provided in in this agreement)

(i) not after the date of termination use the Property in any way other than as permitted by the Licensor

(ii) deliver up to Licensor forthwith all copies of all drawings or other materials depicting the Property in Licensee's power possession custody or control

(iii) notify in writing its customers who have during the Term hereof purchased Products from Licensee that it has ceased to supply Products (in the event a Sell-off Period as provided applies such notification shall be made immediately thereafter) as soon as practicable

(iv) as provided in this agreement pay any Royalties, Advances or Guarantees due as set forth herein (as if all such monies were due and payable as of the date of termination), if in fact so due

## 15. INSOLVENCY OR NONPAYMENT OF FEES

(a) The provisions of Articles 1 and 14 hereof notwithstanding, this Agreement may be terminated immediately at any time by Licensor, should any of the eventualities set forth in Paragraph (i) hereof occur, or by Licensee, should any of the eventualities set forth in Paragraph (ii) hereof occur.

(i) Licensor may terminate this Agreement pursuant to this Article in the event that:

(1) Licensee shall at any time default in the payments hereby made payable as provided in article 14(b)ii

(2) Licensee shall at any time become bankrupt or insolvent or any party shall institute any action or proceeding against Licensee under any bankruptcy or insolvency act or any law for the relief of creditors, or any court or other authority shall appoint a receiver or trustee for the benefit of Licensee's creditors and any of the foregoing shall not be discharged with sixty (60) days.

(ii) Licensee may terminate this Agreement pursuant to this Article in the event that

(1) Licensor shall at any time become bankrupt or insolvent or any party shall institute any action or proceeding against Licensor under any bankruptcy or insolvency act or any law for the relief of creditors, or any court or any authority shall appoint a receiver or trustee for the benefit of

14



Licensor's creditors and this agreement shall not have been assumed on behalf of Licensor within sixty (60) days.

(2) Licensor's trademark is deemed invalid or unenforceable or by reason of the fact that Licensee's use of the Property strictly in accordance with the terms of this Agreement infringes upon the rights of a third party. In these occurrences, royalty advance shall be repaid to Licensee from Licensor.

## 16. THIRD PARTY INFRINGEMENT

(a) If Licensee learns of any infringement, imitation or counterfeiting of the Property or Products or of any use of a trademark similar to the Property or of any instances of the importation and sale in any country of otherwise legitimate Products bearing the Property by any third party, it promptly shall notify Licensor thereof. Upon receipt of Licensee's notice or when any such situation comes to its attention, Licensor shall take such action as it in its sole discretion deems advisable for the protection of its rights in and to the Property and Products. If requested by Licensor, Licensee shall cooperate with and follow the directions of Licensor in connection therewith, including by acting as a plaintiff or co-plaintiff in lawsuits and by causing its officers to execute pleadings and other related documents. Any action contemplated by this paragraph shall be controlled by Licensor and Licensor shall not be required to take any action if it deems it inadvisable to do so and Licensee may not take any action with respect to the Property without Licensor's prior approval. The costs, fees and expenses (including investigatory expenses and legal expenses such as attorneys' fees, court costs and filing fees) incurred in connection with any action relating to Products in any Country taken under this paragraph shall be preapproved and borne by Licensor.

(b) In addition to Licensor's obligation to defend Licensee against any claims or suits arising out of alleged trademark infringement, Licensor shall hold Licensee, its parent and its officers harmless from and against any claims, suits, loss, direct and indirect and damage in the event of an adverse award against Licensor and/or Licensee.

## 17. NON RELEASE

(a) The expiration of this Agreement or its termination for any reason whatsoever shall not operate to release either party hereto from any claim already accrued to the other party hereto at the time of such expiration or termination for payments or the performance of any other obligation provided by this Agreement, nor shall such expiration or termination operate as a waiver of the right of either party hereto to be compensated for any injury or damage arising from any breach of this Agreement which occurred either before or after such expiration or termination.

## 18. OPTION TO PURCHASE OR SELL-OFF LICENSED PRODUCTS

(a) Upon the expiration or termination of this Agreement, Licensee shall prepare a fully written inventory list and submit same to Licensor within twenty (20) days of the expiration or termination of this Agreement. Such list will include orders on hand, work in progress, as well as finished licensed Products.

(b) Licensor, or such other person or persons as Licensor designates, shall have the option to purchase from Licensee, unless Licensee shall have terminated this Agreement pursuant to Article 14(c) and/or Article 15(a)ii hereof, at the Replacement Value (as hereinafter defined) multiplied by 125% (x 1.25), all or a portion of Products to which Licensee has title at the date of such expiration or termination and further provided that Licensee shall furnish Licensor with a written statement of all such inventory within twenty (20) days after termination or expiration of this Agreement Licensee will not need to pay royalties for the sale of products to Licensor. However, that if Licensor or such other person or persons as Licensor shall have designated shall fail to exercise the aforesaid option to purchase such Products by giving written notice to Licensee of its intention to do so within thirty (30) days after the date such inventory statement is received, then Licensor shall not have any option and, unless this Agreement was terminated because

15



of Licensee's breach or unless Licensee owes Licensor money for past due royalties under this Agreement, Licensee shall have the non-exclusive right, during the next one hundred and eighty (180) days, but not beyond, to dispose of such remaining Products within the approved channels of distribution in the Territory, subject to the payment of royalties in accordance with this Agreement with the exception that any royalties accrued during such sell-off period may not be recoupable against any outstanding Guarantee or Instalments. During such one hundred and eighty (180) day sell-off period, Licensor shall have the right to appoint another licensee, importer, distributor, or contractor for the Products in the Territory on a non-exclusive basis or to import and/or distribute the Products itself in the Territory. For the purposes of this Article, the term "Replacement Value" of Products shall mean amounts equivalent to all product costs incurred by Licensee in the manufacture of such Products, minus the product costs of damaged or otherwise unmarketable Products, if any. If Licensee, because of its breach or failure to pay Licensor for royalties due or for finished goods, has no right to a "sell-off period" or if Licensee has unsold Products after any sell-off period, Licensee shall destroy such Products which Licensor does not purchase or contribute to charity of Licensees choosing.

## 19. FORCE MAJEURE

(a) Anything herein contained to the contrary notwithstanding, except with respect to the obligation of Licensee to make payments to Licensor pursuant to this Agreement, neither party hereto shall be liable to the other for loss, injury, delay, damages, or other casualty suffered or incurred by such other party due to strikes, riots, storms, fires, acts of God, or any cause beyond the reasonable control of either party.

## 20. WAIVER

(a) Failure of either party at any time to require the performance of any provision under this Agreement shall not affect the right of such party to require full performance thereafter and a waiver by either party of a breach of any provision of this Agreement shall not be taken or held to be a waiver of any further or similar breach or as nullifying the effectiveness of such provision.

## 21. RELATIONSHIP OF PARTIES

(a) This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture or fiduciary relationship between Licensor and Licensee or as constituting Licensee as the agent or legal representative of Licensor for any purpose whatsoever. Licensor and Licensee's relationship is purely contractual in nature and is governed by this Agreement solely.

(b) Licensee shall have no claim for wrongful or abusive termination against Licensor under the laws of any country upon the actual, attempted or implicit termination of this Agreement or any other relationship between the parties.

(c) Licensee agrees that its sole and exclusive remedy for the breach of this Agreement shall be to require the Licensor to correct the breach and as otherwise provided in this agreement.

(d) In the event that Licensor determines that correction of the breach is an ineffective remedy, Licensee's sole and additional remedy is the right to receive damages in an amount not to exceed the payments by Licensee hereunder.

(e) Licensee is not granted any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of Licensor or to bind Licensor in any manner or thing whatsoever,

16



and nothing herein contained shall give or is intended to give any rights of any kind to any third person against Licensor.

## 22. NONASSIGNABILITY

(a) Neither party hereto shall assign any of its rights nor obligations under this Agreement without the prior written consent of the other party hereto. For the purposes of this Article, a change of controlling interest in License shall be deemed an assignment by Licensee of this Agreement.

## 23. PREMIUMS

(a) Licensee agrees that it will not use or knowingly permit the use of the Products as premiums (as hereinafter defined) without prior written consent of Licensor. As used herein, the term "premium" shall be defined as combination sales, free or self-liquidating items offered to the public in connection with the sale or promotion of a product or service, or any similar scheme or device, the prime intent of which is to use the Products in such a way as to sell the products, services or business image of the user of such item.

(b) Licensor reserves all rights to the utilization of products which feature the Property in connection with any premium, give-away or promotional arrangement, fan club, charitable and/or fund-raising activity, or the like, which reserved right may be exercised by Licensor, concurrently with the rights licensed to Licensee hereunder without regard to the extent to which any such rights may be competitive with Licensee or the license granted hereunder provided none of the foregoing shall compete unreasonably with Licensee's business.

## 24. NOTICES

(a) All royalty notices, payments and statements issued under this Agreement shall be in writing and shall be sent, if to Licensor at:

> VERSACE 19.69 ABBIGLIAMENTO SPORTIVO S.R.L
> Via Daniele Crespi, 1 21052
> Busto Arsizio, Varese - Italy.

If to Master Agent, at:  PJB Brands Limited
         Scholeiou 18B
         Agia Paraskevi
         153 42 Athens, Greece
         Attn: Paul Berrington, Managing Director
         Email: paul@pjbbrand.com

(b) All creative approval notices (artwork, samples, prototypes) issued under this Agreement shall be sent to Agent, at:  PJB Brands Ltd (as above)

      approvals@v1969italia.com

and, if to Licensee, at the address listed under Definitions or at such address as the parties hereto may hereafter stipulate in writing. Unless otherwise specifically provided, all payments to be made hereunder shall be made at the respective addresses of the parties hereto as set forth in this Article or at such other addresses as the parties hereto may hereafter stipulate in writing. Notices or other communications



mailed as herein provided shall be deemed to have been given when received or when an attempt to deliver same was made as evidenced by a duly executed return receipt.

(c) Confidentiality: Any and all non-public, proprietary information of a Party provided by such Party to the other Party pursuant to this Agreement (including but not limited to such information relating to financial or sales data, product development plans, techniques and activities) shall be deemed proprietary and confidential information of the providing Party (hereinafter "**Confidential Information**"). The receiving Party agrees to hold all such Confidential Information in strict confidence and secure and protect it in a manner consistent with the maintenance of the providing Party's ownership and proprietary rights therein and to take appropriate action by instruction or agreement with its agents and representatives who are permitted access to said Confidential Information to satisfy its obligations hereunder. The receiving Party shall use its best efforts to assist in identifying and preventing any unauthorized use, copying or disclosure of the Confidential Information or any portions thereof. Without limitation of the foregoing, the receiving Party shall use commercially reasonable efforts to advise the providing Party immediately in the event it learns or has reason to believe that any person to whom it has given access to the Confidential Information, or any portion thereof, has violated or intends to violate the terms of this Section 24. Notwithstanding the obligations set forth in this Article 24, the confidentiality obligations of a Party shall not extend to information that: (i) is, as of the time of its disclosure, or thereafter becomes, public through a source other than receiving Party; or (ii) is subsequently learned from a third party not under a confidentiality obligation to providing Party. If Confidential Information is required to be disclosed by the receiving Party pursuant to court order or government authority, the receiving Party shall use commercially reasonable efforts to provide notice to the providing Party prior to such disclosure to enable Licensor to seek a protective order or otherwise take such action as Licensor deems appropriate to protect the Confidential Information.

## 25. NO RIGHT TO SUBLICENSE

(a) Licensee has no right to sublicense the rights granted to them under this Agreement to any other party whatsoever.

## 26. AMENDMENTS

(a) This Agreement expresses the entire understanding of the parties hereto and replaces any prior oral or written agreements concerning the subject matter hereof; and Licensee acknowledges that it has not executed this Agreement in reliance upon any promise, agreement, representation or warranty not expressly set forth in this Agreement.

(b) No amendment or supplementation hereof shall be effective or binding on either party hereto unless reduced to writing and executed by the duly authorized representatives of both parties hereto.

## 27. OFFICIAL LANGUAGE

(a) The official language of this Agreement will be English.

## 28. CAPTIONS

The captions and paragraph headings used herein are for convenience only and neither limits nor expands the applicability of the contents thereof.

## 29. CONSTRUCTION

(a)    This agreement and all questions arising in connection with its interpretation and the legal relations and rights and duties between the parties in connection herewith shall be governed and construed in accordance with the substantive law of the State of New York, without regard to conflicts of law and both parties consent to the jurisdiction and venue of any dispute or controversy between the parties to be in the State and Federal courts located in the City and State of New York.

   (b) The UN Convention for the International Sale of Goods shall not apply. However, all disputes and differences arising from and in constitution with this agreement and between the parties shall be finally settled by binding arbitration in accordance with the rules of commercial arbitration, American arbitration association of New York City.

## 30.    NO AGENCY

Nothing in this Agreement shall be construed to make either party hereto the agent or representative of the other party and neither party shall so hold itself out nor shall either party be liable or bound by any act or omission of the other party.



19



## Product Approval Form

### (for licensee to complete)

\* To be completed for each approval stage and accompanied by .jpg files for each product approval and final samples submissions:

| Licensee: | Agent Office: | Territory: |
|---|---|---|
| Contact Name: | Email: | Contract number: |
| Product Description: | Item/SKU #: | Colour variants: |
| **Submission Stage:** | | |
| Concept **X** | Final Design: | Pre-production/strike off: |
| Final Product: | # of final samples: | |
| | | |
| Date of Submission: | In-store date: | |

Product Spec's:
Full Description of product material (fabric/paper/leather etc) quality: _____
_____
_____

Print/Decoration method:

| Print | |
|---|---|
| Embossed print | |
| Applique | |
| 3D | |
| Embroidery | |
| 3D mold | |
| | |

**Licensee Comments:**
(v)

| **Date:** | |
|---|---|
| | |
| | |

**(w)**
**(x)  *To be completed by Licensor:***

| **Approval** |
|---|

| | Approved | | |
|---|---|---|---|
| | Approved with changes | | |
| | Resubmit | | |
| | Not Approved | | |

**Licensor Comments:**

| **Date:** | |
|---|---|
| | |
| | |

# SCHEDULE 2 – Royalty Statement

**VERSACE 19v69 ABBIGLIAMENTO SPORTIVO SRL**
**ROYALTY REPORT**

| | |
|---|---|
| Property | 19V69 |
| Contract Number | |
| Minimum Guarantee | |
| Contractual Currency | EURO |
| Period Reported | |
| Contract Start Date | |
| Contract End Date | |
| Contract Sell-Off Date | |

| SKU NUMBER | SKU DESCRIPTION | CHANNEL | TERRITORY | UNITS PRODUCED | GROSS SALES UNITS | UNIT PRICE | GROSS SALES AMOUNTS | ADJUSTMENT UNITS | ADJUSTMENT AMOUNTS | NET SALES | ROYALTY % | ROYALTY EARNED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | | | | 0.00 € | | | 0.00 € | | 0.00 € |
| | | | | 0 | 0 | | 0.00 € | 0.00 € | 0.00 € | 0.00 € | | 0.00 € |

TOTAL ROYALTY EARNED: 0.00 €
LESS UNEARNED ADVANCE:
ADVANCE BALANCE OR (ROYALTY DUE) 0.00 €





**WIPO | MADRID**
The International
Trademark System

---

## CERTIFICAT D'ENREGISTREMENT

Le Bureau international de l'Organisation Mondiale de la Propriété Intellectuelle (OMPI) certifie que les indications figurant dans le présent certificat sont conformes aux inscriptions portées au registre international tenu en vertu de l'Arrangement et du Protocole de Madrid.

*Ásta Valdimarsdóttir*

Ásta Valdimarsdóttir
Chef du Service des opérations
Services d'enregistrement Madrid
Secteur des marques et des dessins et modèles

Genève, le 11 avril 2013

### 1 154 110

*Date d'enregistrement:* **6 août 2012**
*Date d'échéance:* **6 août 2022**

VERSACE 19.69 ITALIA S.R.L.
Via Daniele Crespi, 1
I-21052 Busto Arsizio (VA)
(Italie).

*Forme juridique du titulaire (personne morale) et lieu de constitution:* Société à responsabilité limitée, Italie.
*Nom et adresse du mandataire:* DR. PROF. FRANCO CICOGNA, Via Visconti di Modrone, 14/A, I-20122 MILANO (Italie).



*Classification des éléments figuratifs:*
25.1; 27.5; 27.7.

*Description de la marque:* La marque est constituée par des éléments graphiques, numériques et littéraux; en particulier on y lit les numéros "19" "69" divisé par un signe graphique d'imagination constitué d'une ligne qui part de gauche sur le numéro "19" et puis il descend au-delà de la base des mêmes numéros

et puis remonte et termine sur le numéro "69"; au dessous on y lit le mot "Italia".

*Liste des produits et services - NCL(10):*

3  Cosmétiques en général, y compris: parfums, parfums sous forme solide; déodorants à usage personnel; savons, savons liquides; savonnettes; produits moussants pour le bain; dentifrices; shampooings; huiles essentielles; lotions pour les cheveux; préparations pour onduler les cheveux de façon permanente et pour la mise en plis; gels; teintures pour cheveux; crèmes pour le visage; mascara; eye-liners; ombres à paupières; crayons pour le maquillage; poudre pour le visage; rouge à lèvres; fonds de teint; crèmes pour le corps; vernis à ongles; durcisseurs pour ongles; huiles et crèmes de bronzage; détersifs; produits de blanchiment; adoucissants pour la lessive; savons; préparations pour blanchir et autres substances pour lessiver; préparations pour nettoyer, polir, dégraisser, décaper et abraser.

9  Appareils et installations de communication et de télécommunication; appareils électroniques; lecteurs CD; lecteurs MP3; appareils et instruments scientifiques; appareils et instruments nautiques, géodésiques et électriques; câbles électriques; interrupteurs électriques; appareils et instruments électroniques; appareils de télévision; décodeurs pour appareils de télévision; appareils de radio, radios récepteurs, radios émetteurs, radiotéléphones, tourne-disques; disques; bandes; vidéo bandes et vidéo enregistreurs; lecteurs optiques de disques; appareils photographiques, cinématographiques, optiques, de pesage, de mesure et de signalisation; caméras de télévision; appareils pour la prise directe et l'émission des spectacles télévisés; répéteurs pour stations radio et télévision; antennes pour radio et télévision; appareils pour la réception et la transmission à distance de signaux radio; lunettes; lunettes de soleil et de vue; verres; appareils de contrôle; d'inspection, de secours, de sauvetage et d'enseignement; appareils automatiques fonctionnant au moyen d'une pièce de monnaie ou d'un jeton; projecteurs et amplificateurs du son; caisses enregistreuses; machines à calculer; extincteurs; programmes d'ordinateurs; ordinateurs; fiches et microprocesseurs de connexion pour ordinateurs; imprimantes pour ordinateurs; modem; télécopieurs; appareils téléphoniques; téléphones cellulaires; casques de

WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

34 chemin des Colombettes
1211 Geneva 20, Switzerland.
www.wipo.int

Tel. 02.76000209 - (10 Linee R.A.) - MILANO - Via Visconti di Modrone, 14/a
E-mail: ufficio@brevetticicogna.com - Telefax 02.76021470 e 02.76009604
DOTT. PROF. FRANCO CICOGNA

protection pour le sport et de sécurité pour le travail, appareils électroniques pour souder.

10  Articles hygiéniques en gomme; c'est à dire préservatifs et vibrateurs en gomme ou en matières semblables à la gomme; articles érotiques à appliquer sur le corps pour la stimulation sexuelle compris dans cette classe; instruments et appareils chirurgicaux, médicaux, dentaires et vétérinaires; seringues à usage médical et pour injection; membres, yeux et dents artificiels; prothèses chirurgicales; ustensiles à usage hygiénique; bandages orthopédiques; gazes; bandes galvaniques à usage médical; articles d'hygiène en caoutchouc; matériels spéciaux à usage chirurgical, pour dentistes et vétérinaires; cure-oreilles; tampons d'oreilles; bouchons d'oreilles.

14  Or; argent; platine; métaux précieux et leurs alliages; objets en métaux précieux et leurs alliages; diamants; brillants; pierres précieuses; articles de joaillerie; bijoux; boutons de manchettes et fixe-cravates; montres-bracelets; horloges en général; bracelets de montres; instruments chronométriques; articles de bijouterie plaqués en métaux précieux; étuis et d'autres écrins à horloge et bijoux.

18  Sacs; sacs à main; valises; sacs à dos; portefeuilles; porte-monnaies; cartables; serviettes porte-documents en cuir et similicuir; pochettes; malles; peaux et articles en peau; cuir et articles en cuir; imitations de cuir et articles; produits en ces matières; parasols; ombrelles; parapluies; cannes; fouets et autres articles de sellerie.

20  Meubles; miroirs; cadres; articles en bois, roseau, jonc et osier; articles en matières plastiques; meubles en matières plastiques; meubles métalliques; meubles pour le camping; matelas élastiques; oreillers.

24  Tissus; tissus élastiques; tissus adhésifs collables à chaud; tissus similicuir; tissus en laine; couvertures de lit, de voyage; nappes; articles textiles; tapisserie en tissu; mou-

choirs en tissu; drapeaux; serviettes; draps; tai
oreillers.

25  Vêtements pour hommes, dames et enfants en gé
compris; robes en peau; chemises; chemisiers;
tailleurs; vestons; pantalons; shorts; maillots de cc
cols; pyjamas; chaussettes; tricots de peau; corsag
te-jarretelles; culottes et caleçons; soutien
combinaisons; chapeaux; foulards; cravates; imp
bles; pardessus; manteaux; maillots de bain; co
sons de sport; anoraks; pantalons de ski; ce
fourrures; écharpés; gants; robes de chambre; cha
en général, y compris: pantoufles; chaussures; cha
de sport; bottes et sandales.

34  Tabac brut et mi-ouvré; articles pour fumeurs; pip
quets; fume-cigares et fume-cigarettes; étuis à ciga
cigarettes; étuis à pipes; cure-pipes; papier à cig
filtres à cigarettes; cigarettes; cigares; allumettes.

*Demande de base:* Italie, 02.08.2012, MI2012C 00788

*Données relatives à la priorité selon la Convention de
Italie, 02.08.2012, MI2012C 007884.*

*Désignations selon le Protocole de Madrid:* Éta
d'Amérique.

*Désignations selon le Protocole de Madrid en vertu de
9sexies:* Chine, Fédération de Russie

*Déclaration d'intention d'utiliser la marque:* Éta
d'Amérique.

*Limitation de la liste des produits et services:* Éta
d'Amérique.

Liste limitée aux classes 9, 14 et 25.

*Date de notification:* 11.04.2013

*Langue de la demande internationale:* Français

24

**SCHEDULE 3- Third Party Manufacturing Agreement**

MANUFACTURER'S AGREEMENT

LICENSEE:

Location of manufacturing facility(ies):

Products:

      The undersigned understands that VERSACE 19.69 Abbigliamento Sportivo s.r.l ( "LICENSOR") has licensed the above-named LICENSEE to manufacture and distribute the above-named products utilizing certain designs and names proprietary to LICENSOR (hereinafter called the "Licensed Products").  In order to induce LICENSOR to consent to the manufacture of the Licensed Products by the undersigned, the undersigned agrees that it will not manufacture the Licensed Products for anyone but the LICENSEE, nor sell or give them to anyone other than the LICENSEE; that it will destroy any damaged or defective Licensed Products which are not delivered to the LICENSEE; that it will not manufacture the Licensed Products anywhere other than the above-named Location; that it will not (unless LICENSOR otherwise consents in writing) manufacture any other merchandise utilizing any of the designs, fonts, or names contained on the Licensed Products.

Manufacturer hereby warrants, represents, covenants, and agrees that the Licensed Products shall be manufactured in full compliance with all applicable laws of the country of manufacture, and in full compliance with LICENSOR'S statement of its manufacturing principles, including, without limitation, the provisions specifying that no forced or underage labour will be used and that all applicable local legislation of the country in which the Licensed Products are manufactured will be complied with.  Manufacturer further warrants, represents, covenants and agrees that it has a business policy, code of ethics, or other form of procedure by which it complies with and monitors compliance with applicable labour regulations.

Manufacturer agrees that it will permit such representative as LICENSOR may from time to time designate to inspect the activities of the undersigned with relation to its manufacture of the Licensed Products; that it will maintain for a period of at least two (2) years after termination of this Agreement accurate and detailed records with relation to its manufacture of the Licensed Products and permit inspection of these records by LICENSOR or its representatives at any time during normal business hours; and that whenever the LICENSEE ceases to require the undersigned to manufacture the Licensed Products, or when the License Agreement between LICENSOR and the LICENSEE expires, whichever occurs first, the undersigned will deliver to LICENSOR, any Licensed Products in its possession, and any molds, plates, engravings, negatives, transparencies, or other devices used to reproduce the said designs and fonts or will give satisfactory evidence of the destruction thereof. The undersigned will not assert any rights in any of the designs, fonts, or names which appear on any of the Licensed Products, and the undersigned will inform the LICENSEE and LICENSOR of any infringement of such designs, fonts or names which come to its attention. LICENSOR shall be entitled to invoke any remedy permitted by law for violation of this Agreement by the undersigned.

      The undersigned Manufacturer further agrees to comply with the requirements outlined on the attached Schedule 3A.

(Name of Manufacturer:)

By: _____

Title: _____

Date: _____

## Schedule 3A
## Licensor Code of Conduct for Suppliers

The following Code of Conduct activities and requirements shall apply to all Manufacturers of Branded / Licensed Products:

- No use of child labour in the manufacturing, packaging or distribution of Branded Products or their components or parts.  The term "child" refers to a person younger than the local / national age for completing compulsory education, but in no case will any person younger than sixteen (16) years of age (or 14 years of age where local laws allow) be employed in the manufacturing, packaging or distribution of Licensor Branded / Licensed Products or their components or parts;
- Provide employees with a safe and healthy workplace in compliance with all applicable laws;
- Only employ persons whose presence is voluntary;
- No use of prison labour (compulsory or voluntary) or corporal punishment or any other forms of mental or physical coercion as a form of discipline of employees;
- Comply with all applicable Child Labour and Labour Standards laws, including minimum wage, overtime pay,  maximum working hours and rest days, young workers, holidays, health & safety, social and health benefits
- Utilise fair employment practices as defined by applicable laws.
- Not discriminate in hiring and employment practices on grounds of race, religion, national origin, political affiliation, sexual preference, age or gender;
- Comply with all applicable environmental laws and industry best practice
- Comply with all applicable laws pertaining to the manufacture, pricing, sale and distribution of Branded / Licensed Products or their components or parts.
- All manufacturing facilities / sites used by the Licensee and its approved Manufacturers to produce Branded / Licensed Products or their components or parts shall:
  - Join and maintain a minimum of "Supplier" grade membership of Sedex for the whole period of Licensor production and for a period of 9 months thereafter.
  - Fully complete (and periodically maintain) the Sedex Self Assessment Questionnaire
  - Ensure links are created within the Sedex system to both the Licensee and Licensor
  - Upload any available Ethical or Labour Standards Audit report to the Sedex system
  - Where no Ethical Audit report is available (or where such reports are unacceptable to Licensor), an Ethical audit of the Licensee and its approved Manufacturers site/s will be required at the Licensee or Manufacturers expense.

The results of such Licensee or Manufacturers audits must achieve a satisfactory standard (judged by Licensor), the report shall be made available to Licensor for the purpose of Grading.  Where the site is judged not to be fully compliant to the required standard (or the Corrective Action/s have not completed in a timely manner) the individual site or sites will be subject to the normal limitations and restrictions placed on the production of Branded / Licensed Products.  No product will be accepted by Licensor unless the manufacturing facility / site is approved by Licensor.

**ANNEX B**
(Latest Style guide attached.)